IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHIRLEY A. CHRISTIAN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO.  15-3762 |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security | : | |

O'NEILL, J.                                                          January  25, 2017

**<u>MEMORANDUM</u>**

Plaintiff Shirley A. Christian brings the present action to challenge the decision by defendant Commissioner of Social Security rejecting her applications for Disability Insurance Benefit and Supplemental Security Income under Titles II and XVI respectively of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u>  Upon review of the record, I find that plaintiff's request for review should be denied and the Commissioner's finding of disability should be affirmed.

**BACKGROUND**

**I.      Procedural History**

On June 13, 2012, plaintiff, who was forty-seven years old at the time,[1] protectively applied for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), alleging disability since August 1, 2007.  R. 179–191.[2]  Following the state agency's denial of her applications on August 29, 2012, plaintiff requested administrative review.  R. 119–131.  Administrative Law Judge (ALJ) Daniel Myers held an administrative

---

[1]      Plaintiff's birth date is October 3, 1963.  R. 93.

[2]      References to the administrative record shall be cited as "R. [page number]."

hearing on December 31, 2013, at which time plaintiff and a vocational expert testified.  R. 27–80.  On March 6, 2014, ALJ Myers issued a decision noting that, based on plaintiff's earnings records, plaintiff had to establish a disability on or before September 30, 2012 in order to be entitled to a period of disability and disability insurance benefits.  (R. 17.)  He determined that plaintiff had the "severe" impairments of degenerative disc disease of the lumbar spine, depression and anxiety which rendered her unable to return to her past relevant work.  R. 17–26.  In light of the vocational expert's testimony, however, the ALJ found plaintiff capable of performing other jobs existing in significant numbers in the national economy and, therefore, deemed her not "disabled" for purposes of her benefits applications.  Id.  Plaintiff then appealed this decision to the Appeals Council, which denied review on May 7, 2015.  R. 1–4.

On July 7, 2015, plaintiff initiated the current action seeking review of the Commissioner's final decision.  She filed her brief in support of her request for review on October 23, 2015, and defendant Commissioner of Social Security responded on November 24, 2015.

## II.     Medical Records[3]

Plaintiff contends that her disability began on August 1, 2007.  R. 185.  The earliest medical notations from 2007–2009 indicate that she primarily sought medical care for various ailments, including depression and anxiety, from Dr. Timothy Quinn of Lancaster Family Associates.  R. 617–22.  Notes from Lancaster Family Associates throughout 2009 revealed that plaintiff still suffered from anxiety and depression and was taking Lexapro, but examinations were relatively unremarkable.  R. 608–610.  In December 2009, plaintiff went to the Lancaster General Hospital emergency room with complaints of a panic attack.  R. 303, 407–09.  Studies

---

[3]     The administrative record is replete with medical documentation, much of which concerns conditions not at issue in this matter.  I will not include a summary of that documentation here.

were normal and plaintiff improved during observation.  R. 304.  She was discharged with a diagnosis of anxiety and chest pain.  R. 307.

The medical record reflects additional visits to her primary care physician throughout 2010, few of which were related to her present impairments.  In August 2010, plaintiff complained of fatigue, headaches and anxiety, and the doctor noted her chronic problems of depressive disorder and anxiety.  R. 734.  In a subsequent visit of September 28, 2010, plaintiff reported improvement in her anxiety.  R. 731.  Although she continued to suffer anxious and fearful thoughts, she stated that "it is not difficult at all to meet home, work, or social obligations."  Id.

On October 29, 2010, after experiencing a week of low back pain, plaintiff first met with John A. Gastaldo, M.D. of Neuroscience & Spine Associates.  R. 509.  Dr. Gastaldo's notes echoed plaintiff's reports that she had had three prior lumbar laminectomies, the last of which was more than ten years ago, and had been pain free until the previous week.  Id.  On examination, plaintiff's gait, station and muscle strength were normal in both her upper and lower extremities.  Id.  Dr. Gastaldo opined that plaintiff had "acute lumbar strain superimposed upon lumbar degenerative disc disease."  R. 510.  He referred her for two weeks of physical therapy, which he expected to dramatically improve her symptoms.  Id.

The record is again relatively sparse until April 8, 2011, when plaintiff returned to Neuroscience & Spine Associates with new complaints of low back pain that had started two months earlier.  R. 505, 331.  Plaintiff indicated to Sandra L. Moffett, P.A.-C that she never attended the prescribed physical therapy and she continued to have pain in her low back, radiating toward the right lower extremity.  R. 505.  She explained that she treated with Aleve, ibuprofen and Tylenol, especially when babysitting small children in her home.  R. 505.

Examination was relatively unremarkable with good range of motion, normal gait, full motor strength and mildly diminished sensation.  R. 505.  On P.A. Moffett's referral, plaintiff underwent an MRI of her lumbar spine.  R. 331.  The results revealed mild stable dextroscoliotic curvature of the lumbar spine and slight progression of degenerative changes at the L4 through S1.  R. 418.

Upon referral from her doctor, plaintiff attended an initial evaluation at Lancaster General Physical Medicine & Rehabilitation on April 12, 2011, where she again reported the onset date of her pain as two months prior.  R. 291.  Although therapy was prescribed three times a week for twelve visits in order to reduce her pain and increase her functionality, r. 290, 503, plaintiff attended only five therapy sessions and then skipped her next three appointments.  R. 280, 285–90.  On May 6, 2011, plaintiff indicated that that she wanted to remain "on hold" until her next doctor's appointment because she felt the exercises were only giving her temporary relief.  R. 280.

Plaintiff had a second MRI on April 20, 2011, which showed degenerative and postoperative changes on the right at L4-L5 where there was some right lateral recess stenosis. R. 315.  During her May 9, 2011 follow up with Dr. Gastaldo, her neurological examination was entirely normal, but her sensory examination showed mildly diminished sensation in the lateral aspect of her right leg.  R. 499.  In addition, she had mild tenderness to palpation to the right of the midline in the lumbar area.  R. 499.  Otherwise, motor examination showed no abnormalities, she had normal muscle tone with no atrophy, strength was 5/5 bilaterally in both upper in lower extremities and her reflexes were 2/2.  R. 500.  Plaintiff's gait was sturdy and symmetric.  R. 500.  Dr. Gastaldo remarked that the MRI showed some degenerative disc disease at the L4-L5

and L5-S1 levels with a small disc herniation at the L5-S1 level, but no neural foraminal stenosis.  R. 500.

Plaintiff underwent several radiographic tests on May 23, 2011.  R. 336.  An X-ray of her lumbar spine revealed severe discogenic disease and degenerative spondylitic change at L4-L5 and L5-S1, mild anterolisthesis of L4 with respect to L5 and retrolisthesis of L5 with respect to S1 and mild scoliosis, but no significant change from the previous April 2011 examination.  R. 337.  Similarly, a bone scan showed discogenic disease and degenerative spondylitic change in the L4-L5 and L5-S1 interspaces, degenerative or arthritic change in the left L4-L5 facet and mild degenerative changes in the lower thoracic spine at T9-T10.  R. 340.

Two days later, plaintiff underwent a lumbar myelogram which showed mild to moderate canal narrowing at L4-L5 with significant disc space narrowing at L4-L5 and L5-S1.  R. 342.  A CT myelogram of the lumbar spine revealed degenerative changes, mainly at L4-L5 and L5-S1 with postoperative changes, scar tissue to the right of the midline at L4-L5 and a small central herniation at L5-S1.  R. 344.  Based on these studies, Dr. Gastaldo opined that plaintiff had "at best, mild stenosis, which may be composed of scar tissue at L4-L5 on the right."  R. 490.  He noted subtle changes at L5-S1 as well, but no obvious root compromise.  Id.  He recommended epidural injections.  Id.

On referral from Dr. Gastaldo, plaintiff went to the Pain Center where she was treated by Cora Bilger, P.A.-C. and Dr. Monteforte.  Plaintiff described sharp, stabbing, shooting pain in her right buttocks and right posterior thigh to the knee with chronic numbness and tingling in her lateral calf.  R. 487.  She rated her pain as a four out of ten and said that, occasionally, the pain makes her feel depressed.  Id.  Musculoskeletal examination revealed that she had normal gait and station, was brisk getting in and out of the chair and on and off the table without assistance,

had full lumbar range of motion, was nontender over lower lumbar facets, but was tender over the right sacroiliac joint with a positive Patrick's maneuver. R. 488. Subsequent to a sacroiliac injection on June 7, 2011, plaintiff stated that she felt an overall 70% relief of her symptoms, had no side effects and was sleeping without difficulty. R. 485. Examination was normal and plaintiff did not feel the need for an epidural at the time. The doctor prescribed no medication. R. 486.

Over the following few months, plaintiff had only sporadic visits to her primary care doctor for isolated problems including insomnia, a persistent cough and congestion, mammogram prescriptions and a recheck of her anxiety. R. 345, 716, 719, 722. At her October 11, 2011 visit, plaintiff reported that her anxiety had improved and it was not at all difficult to meet home, work or social obligations. R. 716. Although she had continued anxiety symptoms, the doctor opined that her depression was stable. R. 716–17. At her February 7, 2012 appointment, she had no gait disturbance or psychiatric symptoms. R. 713.

Plaintiff's next documented complaints of low back pain occurred on March 5, 2012 when she returned to her primary care doctor describing a brand new onset of sharp and stabbing pain radiating into her right thigh. R. 578. Dr. Quinn remarked that she had posterior tenderness, paravertebral muscle spams, right lumbosacral tenderness and a muscle spasm in her lumbar spine. R. 579. Straight leg raises were positive. Id. The doctor put her on Naprosyn and Flexeril and suggested physical therapy, which plaintiff refused. Id. Two days later, plaintiff went to the emergency room with complaints of lower back and right leg pain. R. 317–329. Physical examination revealed tenderness in the right paraspinal muscles of the lumbar spine, but normal reflexes, sensation and motor function. R. 320. A lumbar CT scan showed chronic degenerative disc disease at L4-L5 and a central disc protrusion posteriorly at L5-S1. R. 321.

6

She was discharged with a prescription for Valium and hydromorphone and diagnosed with "acute low back pain improving with narcotic treatment."  Id.

Plaintiff then returned to Dr. Gastaldo on March 12, 2012, who determined that despite normal reflexes and motor sensory exam in her right lower extremity, the severity of her symptoms warranted an MRI and an increase in pain medication.  R. 484.  The subsequent MRI revealed some degenerative changes in the spine itself, but no clear root compromise.  R. 482.  It also showed a large right cystic mass in the pelvis.  Id.  He did not see an obvious cause for the pain and swelling in her right lower extremity.  Id.

On March 21, 2012, plaintiff's pelvic ultrasound showed a large thin-walled ovarian cyst on the right, which the doctor believed to be the likely cause of her right leg pain.  R. 351.  The treating gynecologist recommended surgical removal of the cyst and plaintiff was transferred to the Women and Babies Hospital for a hysterectomy.  R. 669–70.  In her post-operative visit with her family doctor, she continued to complain of persistent lower back pain.  R. 575.  As of her April 25, 2012 follow-up visit with Dr. Gastaldo, however, plaintiff stated that her back pain was totally resolved and the doctor felt no return visit was necessary.  R. 481.

At the end of May 2012, plaintiff first met with James P. Argires, M.D. regarding her continued right low back and leg pain.  R. 563.  Plaintiff's neurological examination was unremarkable as evidenced by negative straight leg raises, no gross motor or sensory reflex impairment, normal ambulation and no gross motor or sensory deficit.  Id.  Dr. Agires diagnosed her with lumbar radiculopathy most likely related to intraneural scarring, multilevel lumbar degenerative diskogenic disease and facet arthropathy bilateral L4-L5 and L5-S1.  R. 564.  He ordered a bone scan and an EMG, but did not recommend surgery.  Id.  The subsequent EMG showed a right L5-S1 radiculopathy with ongoing denervation of the right L5-S1 myotome, but

no evidence of peripheral neuropathy or peroneal neuropathy.  R. 567.  The bone scan showed

evidence consistent with indicated disc disease.  R. 597–98.  During a follow-up visit in June

2012, Dr. Argires attributed her leg pain to the ongoing denervation of the S1 root.  R. 569.

Although she had negative straight leg raises and no gross motor or sensory changes, her reflexes

were totally absent in the lower extremities.  Id.  He changed her medications to Cymbalta and

Lyrica.  Id.

In a July 10, 2012 return visit with Dr. Argires, plaintiff complained of a continued

paresthetic feeling in her right leg improved somewhat with Lyrica.  R. 689.  The doctor

increased her dosage and directed her to increase her physical activities.  Id.  On physical

examination, he found no gross motor or sensory deficit.  Id.  During her September 4, 2012

follow up, plaintiff stated that her lower back pain was managed well with the Lyrica except for

an occasional flare of symptoms.  R. 900.  A recent MRI demonstrated a significant amount of

spinal stenosis from L4-L5 to L5-S1 along with significant facet arthropathy and a disk spur

causing thecal sac and nerve root compression.  R. 901.  At that time, he opined that plaintiff

would consider surgery in the very near future if she did not see any further improvement with

medication.  R. 901–02.   Plaintiff's November 19, 2012 appointment revealed similar

complaints.  R. 1491.  Although plaintiff demonstrated markedly diminished reflexes and

difficulty ambulating, she still had negative straight leg raising and no gross motor or sensory

changes.  R. 1493.

On August 9, 2012, state agency consultant Jay Shaw, M.D. conducted a review of

plaintiff's medical records and completed a residual functional capacity analysis in connection

with plaintiff's recently-filed application for benefits.  R. 87–91.  He opined that plaintiff could

occasionally lift/carry up to twenty pounds in an eight-hour workday, frequently lift/carry up to

ten pounds in an eight-hour workday, stand/walk and sit about six hours in an eight-hour workday and had no push/pull or postural limitations.  R. 87.  He reasoned that although plaintiff had back impairments, he believed her complaints of pain to be out of proportion to the objective findings on imaging studies and on examination.  R. 87–88.

On the same date, state agency consultant Alex Siegel, Ph.D conducted a mental residual functional capacity assessment based on plaintiff's medical records.  Dr. Siegel opined that plaintiff had moderate limitations on her ability to understand and remember detailed instructions, but otherwise had no limitations on her sustained concentration and persistence.  R. 88–89.  He partially credited her complaints stemming from her anxiety disorder and depression and believed her to be limited to work involving one-to-two step tasks and simple, routine, repetitive work in a stable environment.  R. 89.  Based on her activities of daily living, however, he declined to fully credit her claimed mental limitations.  R. 89–90.

Plaintiff met with Dr. Argires again on January 7, 2013, at which time he reviewed her recent EMG, which revealed a severe polymotor, sensory neuropathy superimposed upon rather radicular changes from the past surgical procedures.  R. 1494.  He believed that she was stable on her medications of Soma and Lyrica, as well as BuSpar for depression, and opined that no further surgery was necessary.  Id.  Given the stability of her condition, he discharged her from treatment and remarked that he would see her again if anything changed.  Id.

On that same day, Dr. Argires also completed a spinal impairment questionnaire for purposes of plaintiff's application for social security benefits.  R. 813.  He diagnosed her with multi-level degenerative disc disease, polymotor sensory neuropathy and progressive spinal stenosis with a guarded prognosis.  Id.  In support of his diagnosis, he noted that she had limited range of motion in her lumbar region, lumbar tenderness, muscle spasm, minimal sensory loss,

9

diminished reflexes and muscle weakness.  R. 814.  He also remarked that she had swelling, trigger points, positive straight leg raises and ambulated with a cane.  Id.  He described her pain as intense and constant.  R. 815.  As to her work-related capabilities, he opined that she could sit, stand and walk less than one hour in an eight hour work day, should not sit continuously and would have to get up and move around every thirty minutes.  R. 816.  He further suggested that she could only occasionally lift objects under five pounds and occasionally carry objects under ten pounds.  R. 816–17.  He opined that her impairments were ongoing and would last at least twelve months and, due to her chronic anxiety, she was incapable of even low stress jobs.  R. 817.  Ultimately, he concluded she was "disabled from any and all employment due to progressive polymotor sensory neuropathy."  R. 819.

In a January 9, 2013 visit with her primary doctor, plaintiff re-raised complaints of anxiety and depression.  R. 924.  She stated that she faced social isolation, aggravated by the winter season and chronic pain from her back.  Id.  Although she had been doing well with Celexa and Buspar, she had lately been experiencing more mood swings and feeling more depressed.  Id.  Her mental status examination was almost entirely normal.  R. 926.  The doctor diagnosed her with depressive disorder and anxiety and recommended a psychiatric evaluation.  Id.  After that appointment she began receiving counseling and, as of her next appointment with Dr. Quinn, she reported doing well with her anxiety.  R. 928.

Plaintiff returned to Dr. Argires on March 19, 2013 with bilateral leg discomfort and pain and some difficulty ambulating.  R. 1493.  On examination, straight leg raises were negative and she had no gross motor or sensory changes, but reflexes were markedly diminished and she had trouble ambulating for any distance.  Id.  He made no medication changes and suggested electrodiagnostic studies to be sure he was not overlooking a polyneuropathy.  Id.

The record is devoid of treatment notes until plaintiff's return to Dr. Argires on September 4, 2013. He believed that her condition had worsened, noting that she had difficulty walking for any distances, consistently used a walker, ambulated in a semiflexed position with a flattened lumbar lordotic curve and required assistance in rising from a chair. R. 887. On October 8, 2014, plaintiff met with Dr. Agires's son, surgeon Dr. Perry Agires. R. 873. He fitted her for a lumbosacral brace to help stabilize her lumbar spine. R. 875. Plaintiff also had another MRI which revealed severe degenerative signal changes at L4-5 and L5-S1. R. 876. At L5-S1, she had central canal stenosis secondary to a moderately large midline herniated disk at L4-5 with wide laminectomy defects. R. 876. In addition, she had significant right-sided L4-5 facet arthropathy causing neural foraminal narrowing. Id. Dr. P. Agires recommended surgical treatment of these problems and plaintiff agreed to proceed. R. 877.

On November 18, 2013, plaintiff underwent surgery for bilateral L4-5, L5-S1 decompressions, posterior lumber interbody fusion L4-5, L5-S1, posterolateral fusion L4 to S1 and transpedicular internal fixation L4 to S1. R. 936. An x-ray taken on December 17, 2013 revealed that the pedicle screws were in proper position and that she had normal lumbar alignment and disk spaces. R. 943. In her post-operative visit, Dr. Agires commented that plaintiff was "[d]oing extremely well," her wound was healing nicely, her progress was excellent, she was continuing with only mild medications and she had only some burning discomfort in the left lateral thigh area with a paresthetic feeling in her left foot. R. 944.[4]

---

[4]    The last medical note of record is a June 11, 2014 Impairment Questionnaire completed by plaintiff's primary care doctor, Timothy Quinn. As plaintiff concedes, however, this record was not before the ALJ and, therefore, I cannot consider it when determining whether the ALJ's decision is supported by substantial evidence.

### III.   Administrative Hearing Testimony

At the administrative hearing, plaintiff testified that she was then fifty years old and had obtained a GED. R. 32. Her past relevant work included positions as a production line worker, a commercial cleaner, a cable assembler, a paper collater and packer, a security guard, a solderer, a vacuum sealer of meat products, a line tender in a paint line for cast iron doors and a manufacturer at a wire mesh company. R. 32–43. She explained that all of those jobs involved extensive standing and lifting, making the work difficult for her. Id.

During the hearing, although plaintiff sat in a wheelchair due to her recent surgery, she explained that she had been seeing progress. R. 45. Just prior to the hearing, however, her leg gave out due to nerve damage and she had not yet had a chance to speak to her doctor. R. 44–45. She stated that her leg had just decided to "stop working" about a dozen or so times since her surgery. R. 44, 55–56. As a result of her impairment, she usually would not go to the store alone and could only walk for a block or so before she needed to sit down. R. 56–57.

As to her lifting and carrying abilities, plaintiff indicated that doctors never really gave her any restriction, so she typically would lift or carry whatever she needed for her job at the time. R. 58. For the two to three years prior to the surgery, she felt that she could lift or carry a maximum of five pounds. R. 60.

As to her personal life, plaintiff indicated that she has five grandchildren ranging from three to ten years old, whom she can no longer babysit because of her inability to lift or run after them. R. 49. She had performed full-time babysitting for three of her grandchildren from 2008 into 2009 and was being paid by her daughter-in-law. R. 52. She stopped when her daughter-in-law decided to find a babysitter closer to the area in which she worked. R. 53. The last time she had driven was at the beginning of November 2013. R. 50.

12

With respect to her mental health issues, plaintiff explained that she has had panic attacks for the past ten years.  R. 53.  Although she takes medication for this condition, she still has symptoms at times.  Id.  Her longest panic attacks last as long as ten minutes.  R. 54.

Finally, plaintiff described her medications.  First, she stated that she has a prescription for Oxycodone pain medication, which she takes only as needed and which makes her dizzy.  R. 60–61.  She also takes Carisoprodol, a muscle relaxer, just before she goes to bed.  R. 61–62.  Finally, she takes Lyrica, which she described as "awesome" because it eliminates all the tingling in her legs relating to the nerve damage.  R. 62.

Thereafter, vocational expert (VE) Anthony Caporelli testified regarding plaintiff's ability to perform substantial gainful activity.  The ALJ asked the VE to assume a hypothetical individual of under forty-five years old; with a GED; capable of lifting and carrying twenty pounds occasionally and ten pound frequently; standing and walking up to six hours; sitting up to six hours but requiring the ability to alternate positions at will; limited to no pushing or pulling with any extremity; limited to only occasionally bending, stooping, kneeling, crouching, crawling and stairs; required to avoid hazards such as unprotected heights and non-stationary machinery; limited to exercising only simple work-related judgments; requires no more than occasional changes to the routine work setting; and requires simple, routine and repetitive work in a stable environment.  R. 70.  The VE opined that such a hypothetical individual would not be capable of performing any of plaintiff's past relevant work.  Id.  He testified, however, that such an individual would be able to work on a conveyer line at a bakery or as a sorter of agricultural produce, both of which jobs exist in significant numbers in the regional and national economies.  R. 72.  The ALJ then added to the hypothetical a limitation that the individual could lift and carry no more than five pounds.  R. 72–73.  The VE opined that such an individual could not work as

an agricultural sorter, but could still do conveyer line bakery work.  R. 73.  In addition, the

hypothetical individual could work as an order clerk in the food and beverage industry or as a

"bonder or semi-conductor."  R. 73–74.  The VE also explained that if the hypothetical

individual was between the ages of 45 and 49, he or she could still do the described occupations.

R. 75–76.  If the individual was over fifty, however, he opined that there would be no available

jobs.  R. 76.

On questioning by plaintiff's attorney, the VE stated that if the hypothetical individual

needed a five to ten minute break every hour, no jobs would be available.  R. 78.  If, however,

the individual just needed a walker or wheelchair for ambulation, he or she could still perform all

of the identified occupations.  R. 79.

## STANDARD OF REVIEW

To be eligible for social security benefits, the plaintiff must demonstrate that he cannot

engage in substantial gainful activity because of a medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Brewster v.

Heckler, 786 F.2d 581, 583 (3d Cir. 1986).  The Commissioner has provided the ALJ with a five-

step sequential analysis to use when evaluating the disabled status of each claimant. 20 C.F.R. §§

404.1520(a), 416.920(a). The ALJ must determine: (1) whether the claimant is currently engaged

in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if the

claimant has a severe impairment, whether it meets or equals the criteria listed in 20 C.F.R., pt.

404, subpt. P., appx. 1; (4) if the impairment does not satisfy one of the impairment listings,

whether the claimant's impairments prevent him from performing his past relevant work; and (5)

if the claimant is incapable of performing his past relevant work, whether he can perform any

other work which exists in the national economy, in light of his age, education, work experience and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920.  The claimant carries the initial burden at steps one to four of demonstrating by medical evidence that he is unable to return to his previous employment.  Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir. 1979).  Once the claimant meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant can engage in alternative substantial gainful activity.  Id.

Judicial review of the Commissioner's decision under this sequential analysis is limited to determining whether "substantial evidence" supports the decision.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000).  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999), quoting Pierce v. Underwood, 487 U.S. 552, 564–65 (1988).  When making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986).  In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence.  Id.; see also Gilmore v. Barnhart, 356 F. Supp. 2d 509, 511 (E.D. Pa. 2005) (holding that the court's scope of review is "'limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact'"), quoting Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001).  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

15

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

The reviewing court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Secretary's decision, or it may remand the matter to the Secretary for a rehearing. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984). Outright reversal with an award of benefits is appropriate only when a fully developed administrative record reveals substantial evidence which, on the whole, establishes that the claimant is disabled and entitled to benefits. Id. at 221–22; Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000). Remand is proper if the record is incomplete or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. See Podedworny, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. See Burnett, 220 F.3d at 119–20; Leech v. Barnhart, 111 F. App'x 652, 658 (3d Cir. 2004). Finally, remand may be appropriate where the ALJ's findings are not the product of a complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the record. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994).

## DISCUSSION

Plaintiff alleges that substantial evidence does not support the ALJ's decision as a result of three broad errors. First, she asserts that the ALJ improperly discredited the January 7, 2013 medical opinion of treating neurosurgeon James Argires, M.D. Second, she claims that the ALJ failed to properly evaluate her subjective complaints. Finally, she contends that because the ALJ based his step five finding on a deficient hypothetical to the vocational expert, the decision is not

supported by substantial evidence.  Upon consideration of each individual argument, I will deny plaintiff's request for review and affirm the ALJ's decision.

## I.      Failure to Accord Sufficient Weight to Medical Opinion of Dr. Argires

Plaintiff's first argument challenges the weight the ALJ accorded to Dr. Argires's January 7, 2013 functional capacity assessment.  As noted above, Dr. Argiries completed a spinal impairment questionnaire diagnosing plaintiff with multi-level degenerative disc disease, polymotor sensory neuropathy and progressive spinal stenosis.  R. 813.  He gave her a guarded prognosis, noting that she had limited range of motion in her lumbar region, lumbar tenderness, muscle spasm, minimal sensory loss, diminished reflexes, muscle weakness, swelling, trigger points and positive straight leg raises.  R. 813–814.  He opined that she could sit, stand and walk less than one hour in an eight hour work day, that she should not sit continuously and that she would have to get up and move around every thirty minutes.  R. 816.  He further found that she could only occasionally lift objects under five pounds and occasionally carry objects under ten pounds.  R. 816–17.  Ultimately, he concluded that she was "disabled from any and all employment due to progressive polymotor sensory neuropathy."  R. 819.

The ALJ considered this assessment in the context of the other evidence of record and accorded "limited weight" to Dr. Argires's conclusion that plaintiff was disabled.  In doing so, he reasoned that "Dr. Argires' opinion that the claimant is disabled from any and all employment is not supported by the record as a whole and is not consistent with Dr. Gastaldo's statement that the claimant has 5/5 strength bilaterally in the upper and lower extremities."  R. 24.  In addition, he noted that "said opinion concerns an issue that is reserved to the Commissioner."  Id.

Notwithstanding plaintiff's multiple contrary arguments, I find no error in the ALJ's decision to accord limited weight to Dr. Argires's opinion.  Under applicable regulations and

controlling case law, "opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001), citing 20 C.F.R. § 404.1527(d)(2).  A treating source's opinion on the issue of the nature and severity of a claimant's impairment will be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  The factors to be considered in assigning the appropriate weight to a medical opinion include: length of treating relationship and frequency of examination, nature and extent of treating relationship, supportability, consistency, specialization and other relevant factors.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion."  Morales v. Apfel, 225 F.3d 310, 317–18 (3d Cir. 2000) (quotations omitted).  Further, when disregarding such an opinion, the ALJ must explain on the record his reasons for doing so.  Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986).  It cannot be "for no reason or for the wrong reason."  Morales, 225 F.3d at 317 (quotations omitted).

In this case, the ALJ offered multiple sound reasons for his refusal to accord controlling weight to Dr. Agires's highly-restrictive January 7, 2013 assessment.  First, the ALJ properly recognized that Dr. Argires's statement that plaintiff was "disabled from any and all employment" did not carry any controlling weight.  R. 819.  It is well settled that although a

treating physician's medical opinions are to be accorded deference, the same does not hold true for a treating physician's opinion as to disability: "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and [residual functional capacity] determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).  "The law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown v. Astrue, 649 F.3d 193, 196 n.2 (3d Cir. 2000).

Second, the checklist nature Dr. Argire's assessment warranted the lesser deference accorded by the ALJ.  The Court of Appeals has observed that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank"—as is the case here—"are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).  This is particularly true when those residual functional capacity assessments are unaccompanied by thorough written explanations or narratives. J.D. ex rel. Martinez v. Comm'r of Soc. Sec., 629 F. App'x 232, 233 (3d Cir. 2015); Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986).  In this case, Dr. Argires merely checked off various symptoms and limitations with no explanation other than some cursory notations in response to pointed questions.  Such a bare report does not merit the enhanced deference typically given to treating physician opinions.

Third, the ALJ recognized inherent contradictions between Dr. Argires's assessment and his treatment notes.  Although "[t]reating physicians' reports should be accorded great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time," Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (internal quotations omitted), this "assumption does not turn on impermissibly mechanical deference to the treating physician's opinion." Cyprus Cumberland Res. v. Dir., Office of Workers' Compensation Programs, 170 F. App'x 787, 792 (3d Cir. 2006).  An ALJ's

decision to reject the opinion of a treating physician is proper where the physician's own treatment records do not support his/her opinion and the record contains medical evidence contrary to his/her opinion.  See Grogan v. Comm'r of Soc. Sec., 459 F. App'x 132, 137–38 (3d Cir. 2012); see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The ALJ need not accept an opinion of a physician—even a treating physician—if it is conclusory and brief and is unsupported by clinical findings.").  The Court of Appeals has repeatedly held that when a treating physicians' notes, analyzed as a whole, contradict the physician's opinion on a claimant's ability to work, an ALJ may properly rely on those notes in determining that the opinion is entitled to little or no weight.  See, e.g., Dula v. Barnhart, 129 F. App'x 715, 719 (3d Cir. 2005); Humphreys v. Barnhart, 127 F. App'x 73, 76 (3d Cir. 2005); see also Casillas v. Astrue, 671 F. Supp. 2d 635, 639 (E.D. Pa. 2009) ("Because the statements proffered by Plaintiff's treating physician and therapist and the consultative psychologist were inconsistent with—and at times contradicted by—the contemporaneous treatment notes, the ALJ had reason to discount the statements, as she explained in her opinion.").

In this matter, Dr. Argires's assessment stands in stark contrast with his longitudinal treatment notes recorded contemporaneously with his examinations.  For example, during plaintiff's first visit in May 2012, neurological examination was unremarkable with negative straight leg raising and no gross motor or sensory reflex impairment.  R. 563.  In June 2012, although Dr. Argires commented that reflexes were totally absent in plaintiff's lower extremities—a symptom not identified in his assessment—he continued to find negative straight leg raising and no motor or sensory changes.  R. 569.  Likewise, in July 2012, plaintiff had no motor or sensory deficit.  R. 689.  Dr. Argires commented that plaintiff used a cane to walk on uneven surfaces, contrary to his assessment opinion that she could barely walk at all.  Id.  In

November 2012, plaintiff demonstrated markedly diminished reflexes and difficulty ambulating, but still had negative straight leg raising and no gross motor or sensory changes. R. 1493. Finally, on January 7, 2013—the same date he completed plaintiff's functional assessment—Dr. Argires examined plaintiff, determined that she was stable on her medications, declined to recommend surgery and completely discharged her from treatment.[5] R. 1494. Notably absent from any of his examination notations is (1) any finding of limited range of motion in her lumbar spine, muscle spasm, sensory loss, muscle weakness, swelling, trigger points or positive straight leg raise tests, all of which formed the basis for his disability opinion; (2) any suggestion that she should restrict her activities; or (3) any comment that plaintiff suffers limitations comparable to those listed in the impairment assessment.[6]

Fourth, as noted by the ALJ, other medical evidence of record also undermined Dr. Argires's assessment. Prior to seeing Dr. Agrires but subsequent to her alleged date of disability in 2007, plaintiff treated with Dr. Gastaldo for her back pain. In her initial October 2010 visit with Dr. Gastaldo, plaintiff's gait, station and muscle strength were normal in both her upper and lower extremities. R. 509. Further, her neurological examination was entirely normal and her reflexes were symmetric. Id. Likewise, in April 2011, her examination results were relatively unremarkable with good range of motion, normal gait, full motor strength and mildly diminished

---

[5]    In her brief, plaintiff references a treatment note from September 4, 2013 as support for Dr. Argires's assessment. Pl.'s Request for Review, ECF No. 8, at p. 9, citing R. 887. Because that note was created approximately nine months after the assessment, it could not have formed the basis for Dr. Argires's opinion.

[6]    Plaintiff argues that it was unreasonable for the ALJ to discredit Dr. Argires's assessment based on the fact that, at the post-operative visit in December 2013, plaintiff was reported to be doing well. Pl.'s Request for Review, ECF No. 8, at p. 10. As that notation was subsequent to Dr. Argires's November 2012 assessment, however, the ALJ did not use it discredit the assessment, but rather to accord less weight to plaintiff's testimony. Accordingly, I will address the use of that note in the section of this opinion discussing the ALJ's credibility assessment.

sensation.  R. 505.  Although plaintiff had mildly diminished sensation and mild tenderness in

the right leg and lumbar area in May 2011, motor functioning was normal, she had normal

muscle tone with no atrophy, strength was 5/5 bilaterally in both upper in lower extremities, her

reflexes were 2/2, her lumbar range of motion was normal in flexion and extension and her gait

was sturdy and symmetric.  R. 500.  Notes from the Pain Center in June 2011 similarly indicated

that plaintiff had normal gait and station, was brisk getting on and off the table without

assistance, had full lumbar range of motion and had tenderness only over the right sacroiliac

joint.  R. 488.  These findings were echoed in the emergency room in March 2012, where

physical examination revealed that despite tenderness in the right paraspinal muscles of the

lumbar spine, plaintiff had normal reflexes, sensation and motor function.  R. 320.  In a follow-

up visit in March 2012, Dr. Gastaldo remarked that her reflexes and motor sensory exam

remained normal.  R. 484.  As of her April 25, 2012 follow-up visit with Dr. Gastaldo, plaintiff

stated that her back pain was totally resolved, and no return visit was scheduled.  R. 481.

 Finally, the ALJ properly found that the residual functional capacity assessment of Dr.

Jay Shaw undermined Dr. Argires's restrictive report.  The Court of Appeals has held that

although "the opinions of a doctor who has never examined a patient have less probative force as

a general matter, than they would have had if the doctor had treated or examined him," Morales

v. Apfel, 225 F.3d 310, 320 (3d Cir.2000) (internal quotations omitted), where "the opinion of a

treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may

choose whom to credit."  Id. at 317; Becker v. Comm'r of Soc. Sec. Admin., 403 F. App'x 679,

686 (3d Cir. 2010).  The ALJ, of course, "'cannot reject evidence for no reason or for the wrong

reason,'" Morales, 225 F.3d at 317, quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999),

and can only give the opinion of a non-treating, non-examining physician weight insofar as it is

supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation provided for the opinion.  See SSR 96–6p, 1996 WL 374180 (S.S.A.), at *2 (July 2, 1996).  The Court of Appeals has clarified that "[s]tate agen[cy] opinions merit significant consideration" as these individuals are experts in the Social Security disability programs.  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), citing SSR 96-6p.

In this case, Dr. Shaw reviewed the record to date and opined that although plaintiff had a back impairment she was far less limited than described by Dr. Argires in his January 2013 assessment.  He believed plaintiff actually had the capability of occasionally lifting/carrying up to twenty pounds in an eight-hour workday, frequently lifting/carrying up to ten pounds in an eight-hour workday and standing, walking and sitting about six hours in an eight-hour workday and had no push/pull or postural limitations.  R. 87–88.  By way of explanation, Dr. Shaw stated:

> Claimant has history of back surgeries in past but multiple recent imaging studies of the spine ha[ve] shown mild degenerative disease without neurocompressive pathology.  Visit with Neurosurgeon from 7/9/12 indicated the claimant alleging paraesthesia in the right LE but no sensory/motor deficits, and she was started on Lyrica for symptomatic benefit.  Claimant alleges severe back and legs pain that is out of proportion to the objective findings on imaging studies and on examination.  Claimant has BMI of 34; however, the records do not show significant musculoskeletal impairments that may be magnified due to her obesity.

R. 87.  Although the ALJ gave this opinion significant weight as consistent with Dr. Gastaldo's statements and the other evidence of record, he did not simply rubberstamp this assessment.  Rather, he found that, based on the medical record and Dr. Argires's treatment notes, plaintiff's impairment imposed even greater limitations including the need for a sit-stand option, a

preclusion on pushing and pulling with any extremity and a limitation to only occasional

bending, stooping, crawling, kneeling, crouching and climbing stairs.  R. 21.

In an effort to challenge the ALJ's analysis of Dr. Argires's assessment, Plaintiff now

suggests that the ALJ disregarded other record evidence that bolstered Dr. Argires's opinion.

She cites, for example, to Dr. Gastaldo's May 9, 2011 notation that lumbar flexion and extension

caused discomfort, that plaintiff had diminished sensation in the lateral aspect of her right leg

and tenderness to palpation in the midline of the lumbar area and that review of systems was

positive for fatigue.  R. 498–99.  In addition, plaintiff references the March 9, 2012 emergency

room doctor's report that plaintiff appeared to be uncomfortable, had tenderness in her right

lumbar paraspinal muscles and had chronic degenerative disc disease with a central disc

protrusion.  R. 320–21.  She further argues that the ALJ failed to acknowledge that Dr. Argires's

examination of plaintiff performed on May 31, 2012 in connection with electrodiagnostic testing

revealed diminished strength 3+/5 plantar flexion, 4/5 knee extension, diminished sensation in

plaintiff's lateral calf and the plantar surface of her right foot and trace reflexes at the ankle.  R.

566.  In addition, the ALJ did not mention Dr. Quinn's documentation of moderate pain with

motion in plaintiff's lumbar spine, r. 573, positive straight leg raising test, r. 579, right

lumbosacral tenderness, r. 579, 918, and moderately reduced range of motion.  R. 693.[7]

An ALJ, however, need not explicitly evaluate all evidence a claimant presents, "as long

as the ALJ articulates at some minimum level her analysis of a particular line of evidence."

Phillips v. Barnhart, 91 F. App'x 775, 780 n.7 (3d Cir. 2004).  The ALJ's failure to cite specific

evidence does not establish that the ALJ failed to consider it.  Black v. Apfel, 143 F.3d 383, 386

(8th Cir. 1998).  In this case, the ALJ acknowledged the foregoing evidence and agreed that

---

[7]    The ALJ discussed the records from plaintiff's primary care physician, Dr. Quinn.  R. 22.

plaintiff suffered from a back impairment that caused tenderness, discomfort and some diminished sensation.  In connection with that determination, he imposed numerous functional limitations on plaintiff.  The ALJ remarked, however, that that the medical evidence—including the records now identified by plaintiff—did not support the extreme limitations and symptomology described by Dr. Argires on his impairment questionnaire.  Under a substantial evidence standard of review, such an analysis survives judicial scrutiny.

Ultimately, the ALJ did not wholly reject Dr. Argires's assessment of plaintiff's work-related abilities, but rather rejected the degree of Dr. Argires's imposed limitations, giving the limitations weight only to the extent that they found support in the other medical evidence of record.  In light of the record showing plaintiff's less than disabling impairments, the ALJ's refusal to give the assessment controlling weight stands well-supported by substantial evidence.  Nothing in the Social Security regulations requires that the ALJ favor a treating physician's rote functional capacity assessment unaccompanied by any detailed explanation over the other evidence in the record, including the treating physician's own treatment notes, reports from other medical care providers and an evaluation by a state agency doctor.  Accordingly, I affirm the final decision of the Commissioner of Social Security on this point.

## II.     Failure to Fully Credit Plaintiff's Subjective Complaints

Plaintiff's second argument concerns the validity of the ALJ's credibility assessment.  Upon review of the record, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  R. 22.  Plaintiff now objects to this credibility determination, arguing simply as follows:

> In support of his finding that Plaintiff was not credible, the ALJ summarizes some of her complaints, including her claim that "her medications cause tiredness and dizziness" (Tr. 22; see also Tr. 61). But the ALJ does not make any specific finding concerning the credibility of Plaintiff's claims of pain and fatigue. In her testimony, Plaintiff described ongoing pain and fatigue that would be incompatible with any full-time job. Plaintiff's testimony is supported by the opinion of her treating neurosurgeon who identified pain and fatigability as among her primary symptoms. (Tr. 815).

Pl.'s Br. Supp. Request for Review, ECF No. 8, at p. 11.

Plaintiff's cursory argument offers little substance on which I can review her challenge. Nonetheless, considering the applicable jurisprudence and the record in its entirety, I find that the ALJ's credibility determination bears the support of substantial evidence. It is well established that an ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993), citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). Objective evidence of the symptoms themselves need not exist, although there must be objective evidence of some condition that could reasonably produce them. Green v. Schweiker, 749 F.2d 1066, 1070–71 (3d Cir. 1984). Where medical evidence supports a claimant's complaints, the "complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." Mason, 994 F.2d at 1067–68 (quotations omitted). The ALJ, however, "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible." Weber v. Massanari, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001), citing Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974).

Under the regulations, the kinds of evidence that the ALJ must consider when assessing the credibility of an individual's statements include: the individual's daily activity; location,

duration, frequency and intensity of the individual's symptoms; factors precipitating and

aggravating the symptoms; the type, dosage, effectiveness and side effects of medication taken to

alleviate the symptoms; treatment, other than medication, received for relief of the symptoms;

any non-treatment measures the individual uses to relieve pain or symptoms; and other factors

concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§  404.1529(c)(3), 416.929(c)(3).  Moreover, the ALJ should account for the

claimant's statements, appearance and demeanor; medical signs and laboratory findings; and

physicians' opinions regarding the credibility and severity of plaintiff's subjective complaints.

Weber, 156 F. Supp. 2d at 485, citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186

(S.S.A. 1996).  Ultimately, the ALJ's "'determination or decision must contain specific reasons

for the finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reasons for that weight.'"  Schwartz v.

Halter, 134 F. Supp. 2d 640, 654 (E.D. Pa. 2001), quoting SSR 96-7p; Schaudeck v. Comm'r of

Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999).

    Pursuant to these principles, the ALJ's credibility assessment survives a substantial

evidence review.  As a primary matter, the ALJ did not entirely discredit plaintiff's testimony.

Rather, he accepted that plaintiff suffered symptoms including back pain that spreads to her

buttock, knee and ankle; pain that affects her ability to sleep, lift, squat, bend, stand, reach, walk,

sit, kneel and climb stairs; lower extremity limitations requiring the use of an assistive walking

device; and tiredness and dizziness resulting from her medications.  R. 22.  Indeed, the ALJ

included many of these limitations in his residual functional capacity assessment.  Nonetheless,

to the extent plaintiff claimed that these symptoms resulted in her complete inability to perform

any substantial gainful activity, the ALJ found that the "intensity, persistence and limiting effects of these symptoms" were not entirely credible.  R. 22.

To the extent the ALJ discredited the severity of plaintiff's pain and fatigue complaints, his discussion properly relied on factors set forth in the regulations.  First, it is well established that the ALJ may consider the extent of daily activities in determining the credibility of a claimant's testimony.  Turby v. Barnhart, 54 F. App'x 118, 121 n.1 (3rd Cir. 2002).  The ALJ appropriately noted that, despite plaintiff's alleged onset date of August 1, 2007, there was a twelve year gap between plaintiff's previous back surgery in 2002 and her recent back surgery in 2013.  R. 23.  The ALJ reasoned that this gap in time "along with the claimant's work history, indicates to the undersigned that the claimant was more functional than alleged between the third and fourth surgeries."  Id.  Indeed, according to the record, between 2007 and 2009, plaintiff held multiple different jobs, undermining her claims that her pain and fatigue were work preclusive. R. 196–97.  In addition, plaintiff testified at the administrative hearing that from 2008 to 2009, she babysat fulltime for three of her grandchildren and stopped only because her daughter-in-law wanted to find a sitter closer to the school district in which she taught.  R. 52–53.

Second, "the ALJ is expressly empowered to draw negative inferences, even concerning the claimant's statements about his subjective pain, from a lack of consistency between the claimant's various statements or between his statements and the medical evidence."  Vitatoe v. Barnhart, No. 01–831, 2003 WL 21640374, at *9 (D. Del. Jul. 10, 2003), aff'd, 96 F. App'x 821 (3d Cir. 2004); see also 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  The ALJ found such a lack of consistency between the severity of her pain symptoms she reported to be disabling and work-preclusive in her social security application and the severity of her pain symptoms as reflected in the record.  Visits with her family doctor from late 2007 through 2008 revealed no complaints of

back pain.  R. 617–22.  Throughout early 2009, plaintiff had no pain, fatigue or dizziness complaints.  R. 609–10.  In August of 2010, plaintiff complained of some back pain, as well as headaches, fatigue and anxiety related to some situational stress.  R. 734–36.  These problems were mostly resolved by September 2010 where plaintiff had no fatigue or pain complaints.  R. 731.  Plaintiff's first consistent complaints of back pain came in late October 2010—more than three years after her alleged onset date—when she stated to Dr. Gastaldo that she had "about a week history" of low back pain to the right side and only sought treatment because of her three prior laminectomies more than ten years prior.  R. 509.  Plaintiff did not follow through on physical therapy and did not return to Dr. Gastaldo until April 8, 2011, at which time she did not complain of any fatigue and indicated that she was still babysitting and lifting small children.  R. 505.  Examination was relatively normal.  Id.  Following a sacroiliac injection in June 2011, plaintiff reported her pain as a two out of ten and stated that she had no difficulty sleeping and no depression resulting from pain.  R. 485.  Despite visits with her family doctor in the interim, plaintiff did not complain of back pain again until eight months later, on March 5, 2012, at which time she indicated that her back pain had started again that morning.  R. 578.  Thereafter, the record contains sporadic notations of back pain, but nothing indicating either the extreme limitations described by plaintiff or the associated dizziness and fatigue.[8]  She started treating her back pain with Dr. Argires in May 2012, but the records contain no notations of disabling

---

[8]   See R. 661 (March 11, 2012, lumbar tenderness, but normal reflexes, sensation and motor function); R. 482 (no clear root compromise on her MRI); R. 575 (March 28, 2012, back pain problem is persistent but improving, no mention of dizziness or fatigue); R. 481 (April 25, 2012, "[h]er [back] pain is totally resolved."); R. 695–97 (May 1, 2012, cursory mention of back pain with no mention of dizziness or fatigue).

pain, fatigue or dizziness.[9]  Between March 19, 2013 and September 4, 2013, plaintiff had no

follow up care with respect to her back.  R. 885.

Third, given that plaintiff's complaints of more severe back pain did not begin until

September 2013, shortly after which she underwent surgery, the ALJ had no basis to conclude

that plaintiff had become disabled prior to her date last insured of September 30, 2012 or had

limitations from pain which would be expected to last for more than twelve months, as required

by the Social Security regulations.  Indeed, the ALJ commented that "[w]hile the claimant may

have been laid up after the fourth surgery, her post surgical examination was excellent . . . and

there is no reason to think that the claimant will not be back to light duty soon."  R. 23.  Dr.

Argires specifically commented that plaintiff was "[d]oing extremely well" and that she needed

only mild pain medications.  R. 944.  At her hearing, plaintiff confirmed this report and testified

that she had been getting better until her leg gave out a few days earlier.  R. 45.  The ALJ

appropriately relied on this evidence to find that nothing in the medical record demonstrated that

any disabling pain would continue for the requisite period of time.

Finally, to the extent plaintiff challenges the ALJ's failure to credit her complaints that

her medications made her tired and dizzy, I find no merit to this allegation.   The sole notations

in the record regarding fatigue and dizziness are:  (1) plaintiff's application for benefits where

she stated that she took Lyrica and Citalopram, which caused tiredness and dizziness, r. 229, and

(2) Dr. Argires's January 2013 statement that plaintiff had "fatigability."  R. 815.  Otherwise, the

---

[9]   See R. 563 (May 30, 2012, chronic low back pain, but able to ambulate relatively well); R.
627 (June 13, 2012, intractable leg pain, but no gross motor or sensor changes); R. 905–06 (July
10, 2012, pain is much improved, complaints only of "annoying" paresthetic feelings in her right
leg); R. 900 (September 4, 2012, lower back pain is well managed with Lyrica, but with an
occasional flare of symptoms); R. 895 (November 19, 2012, report of recent flare of back and leg
pain for one month which has begun to resolve; notation of some difficulty ambulating); R. 1494
(January 7, 2013, Dr. Argires discharges plaintiff from his care).

record is devoid of any mention of fatigue or dizziness resulting from her medications.  Indeed, although she had been taking these medicines for an extended period of time in the record, plaintiff does not identify, and I cannot find, any mention of these complaints of dizziness or fatigue.  Moreover, at the administrative hearing, plaintiff indicated that although the Oxycodone makes her dizzy, she only takes it as needed; the Carisoprodol makes her dizzy, but she takes that at night before she goes to sleep; and the Lyrica is "awesome" with no reported side effects. R. 61–62.  Given this evidentiary record, the ALJ's decision to not credit plaintiff's singular complaint of dizziness and fatigue is well supported by substantial evidence.

"[I]t is well within the discretion of the Secretary to evaluate the credibility of a plaintiff's testimony and to render an independent judgment in light of the medical findings and related evidence regarding the true extent of such disability."  Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J.1995), aff'd, 85 F.3d 611 (3d Cir. 1996).  I find that while the ALJ's credibility analysis lacks some detail, it is "'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'"  Schwartz v. Halter, 134 F. Supp. 2d 640, 654 (E.D. Pa. 2001), quoting Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. 1996); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999).  Therefore, I affirm this portion of the decision as well.

## III.    Deficient Hypothetical to the Vocational Expert

Plaintiff's final challenge to the ALJ's decision concerns the hypothetical question posed to the vocational expert during the administrative hearing.  The ALJ explicitly found, at step three of the sequential analysis, that plaintiff has moderate difficulties in social functioning, r. 21, which according to the Listings, deals with a claimant's "capacity to interact independently,

appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C(2).  Yet, when posing a hypothetical to the vocational expert, the ALJ did not include any comparable limitation.[10]  In response to the hypothetical, the VE opined that such an individual would be able to work at jobs that exist in significant numbers in the regional and national economies.  Plaintiff now contends that the vocational expert's testimony does not constitute substantial evidence for the ALJ's step five finding because the ALJ failed to include in the hypothetical any limitations to accommodate plaintiff's moderate difficulties in her ability to maintain social functioning.

Although this issue causes me some hesitation, I nonetheless affirm the ALJ's decision. In order for a vocational expert's testimony to constitute substantial evidence, it must reflect all of the claimant's impairments that are supported by the record.  Allen v. Barnhart, 417 F.3d 396, 407 (3d Cir. 2005).  As the Third Circuit emphasized:

> While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.

Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). The law does "not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant," but does require that the hypothetical "accurately convey to the vocational expert all of a claimant's *credibly*

---

[10]    As noted above, the ALJ asked the VE to assume a hypothetical individual of under forty-five years old; with a GED; capable of lifting and carrying twenty pounds occasionally and ten pound frequently; standing and walking up to six hours; sitting up to six hours but requiring the ability to alternate positions at will; limited to no pushing or pulling with any extremity; limited to only occasionally bending, stooping, kneeling, crouching, crawling and stairs; required to avoid hazards such as unprotected heights and non-stationary machinery; limited to exercising only simple work-related judgments; requires no more than occasional changes to the routine work setting; and requires simple, routine and repetitive work in a stable environment.  R. 70.

*established limitations.*"  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (internal

quotation marks omitted) (emphasis in original).  An ALJ's failure to do so renders the question

"deficient and the expert's answer to it cannot be considered substantial evidence."  Chrupcala v.

Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

      In some cases, an ALJ's failure to include in the hypothetical a limitation identified at a

previous step of the sequential analysis has been deemed cause for remand.  For example, in the

analogous case of Seagraves v. Colvin, No. 13-718, 2014 WL 657549 (W.D. Pa. Feb. 20, 2014),

the ALJ found the claimant to have "moderate" limitations in social functioning, but then failed

to incorporate those limitations into the RFC.  Id. at *2.  In response to a hypothetical question,

the vocational expert identified jobs existing in the national economy that such an individual

could perform.  Id.  When the ALJ amended the hypothetical to include anger outbursts, the

vocational expert explained that no jobs would exist for such an individual.  Id.  Despite this

response, the ALJ determined the claimant was not disabled.  Id.  The court recognized that the

ALJ may have had some other, justifiable but unexplained reason for excluding social limitations

from the hypothetical, but could not discern from the record his reasons for doing so.  Id.

Therefore, the court remanded to allow the ALJ to either "clarify his reasoning" for excluding

social functioning limitations or "obtain VE testimony in response to a complete and accurate

hypothetical."  Id.

      Similarly, in Decker v. Colvin, No. 14-428, 2015 WL 106589, at *4–6 (W.D. Pa. Jan. 7,

2015), the ALJ found, at step three of the sequential analysis, that "[i]n social functioning, [the

plaintiff] has moderate restriction."  Id. at *5.  This conclusion was repeated after a summary of

the evidence considered by the ALJ in evaluating the Paragraph B and C criteria under Listings

12.04 and 12.06.  Id.  Neither the hypotheticals posed by the ALJ to the vocational expert nor the

RFC ultimately adopted by the ALJ, however, accounted for the plaintiff's difficulties with social functioning.  Id.  Aside from a single subsequent statement relating to the creation of the RFC, which inaccurately stated that she found that the plaintiff had *"mild* difficulties with social functioning," the ALJ "did not discuss, or even allude to, any intentional decision to exclude these difficulties from the RFC."  Id.  The court concluded that "[s]tanding alone, this later pronouncement that [the plaintiff] had only 'mild' difficulties at step three cannot effectively establish the ALJ's intent to exclude [the plaintiff's] social functioning impairments, because even 'impairments that are not severe' are to be considered in assessing a claimant's RFC."  Id.  In doing so, the court remarked that the record contained conflicting evidence regarding whether plaintiff's social functioning limitations affected his RFC and found that the ALJ needed to at least explain why these limitations were omitted from the RFC.[11]  Id. at *5–6.

---

[11]    Other cases from within the Third Circuit have similarly agreed that remand is the appropriate remedy when the ALJ makes findings of moderate mental limitations, but fails to either include such limitations in the hypothetical question or RFC or explain his/her reasons for excluding them.  See, e.g., Salmela v. Colvin, No. 13-5369, 2015 WL 1954353, at *3 (E.D. Pa. Apr. 30, 2015) (remanding cases where the ALJ clearly found that the plaintiff had moderate limitations in social functioning, but failed to include those limitations in her residual functional capacity assessment or her hypothetical to vocational expert); Valansky v. Colvin, No. 13-573, 2014 WL 469893, *2 (W.D. Pa. Feb. 6, 2014) (finding the hypothetical inadequate where the ALJ found the claimant to have both "moderate limitations in his social functioning" and a "moderate impairment with concentration, persistence, and pace," but then failed to account for either restriction in the hypothetical posed to the vocational expert); Debias v. Astrue, No. 11-3545. 2012 WL 2120451, *4 (E.D. Pa. June 12, 2012) (finding that the hypothetical did not accurately convey all of the claimant's mental impairments when, after finding the claimant to have "a moderate impairment in social functioning," the ALJ then posed a hypothetical to the vocational expert which "only provided the limitation that the [the claimant] be given 'no detailed instructions' in his job"); Lam v. Astrue, No. 09-4331, 2011 WL 1884006, at *14 (E.D. Pa. Mar. 31, 2011) ("Until the ALJ forecloses the possibility that the VE could have changed his testimony if the ALJ had included limitations pertinent to the ALJ's own finding of 'moderate' limitations in social functioning, the VE's answer to the hypothetical as posed cannot be said to constitute substantial evidence upon which the ALJ can properly rely."), report and recommendation adopted, 2011 WL 1882639 (E.D. Pa. May 17, 2011).

By contrast, many other cases from within the Third Circuit have recognized that remand

may be unnecessary where, despite an ALJ's imposition of limitations in the third step of the

sequential analysis that he or she does not subsequently include in an RFC assessment or

hypothetical, the ALJ nonetheless offers sufficient and substantiated reasons for why the

limitations should not be included.  For example, in <u>Clayton v. Colvin</u>, No. 14-400, 2014 WL

5439796 (W.D. Pa. Oct. 24, 2014), the ALJ made a factual finding that Plaintiff experienced the

following limitations: "mild limitation in activities of daily living; moderate difficulties in

maintaining social functioning: [and] moderate difficulties in maintaining concentration,

persistence or pace." <u>Id.</u> at *8  The ALJ subsequently determined that, despite his moderate

impairment in social function, the plaintiff had the residual functional capacity to perform work

without any explicit limitation on interactions with co-workers, supervisors or the general public.

<u>Id.</u>  Consequently, the ALJ's hypothetical question to the vocational expert accounted for the

plaintiff's moderate limitations in concentration, persistence and pace, but did not incorporate the

plaintiff's moderate limitation in social functioning.  <u>Id.</u>  The ALJ explained this omission by

noting that, despite his impairment, the plaintiff was able to take college classes, use public

transportation, and visit with his relatives on a weekly basis.  <u>Id.</u>  The court found that "the

record provide[d] ample evidence to support the ALJ's decision not to incorporate an explicit

restriction on social function into her hypothetical question."  <u>Id.</u> at * 9; <u>see also</u> <u>Galvin v.</u>

<u>Astrue</u>, No. 08-1317, 2009 WL 2177216, at *10 (W.D. Pa. July 22, 2009) (holding that, although

the ALJ found moderate deficiencies in several areas of function, the record did not support the

need for a more specific incorporation of those limitations into the plaintiff's residual functional

capacity); <u>Briggs v. Astrue</u>, No. 12-957, 2013 WL 607833, at *11 (W.D. Pa. Feb. 19, 2013)

(ALJ's hypothetical question was not required to include a limitation on plaintiff's ability to

interact with others because such a limitation was not supported by the record); Christner v. Astrue, No. 08-991, 2009 WL 186010, at *9 (W.D. Pa. Jan. 27, 2009) (same).

I find that this matter falls within latter category of cases because I am able to discern from the record the ALJ's rationale for not including any social limitations in the RFC or hypothetical to the VE. At step three, the ALJ stated that plaintiff had moderate difficulties in social functioning. R. 21. He then clarified that "[a]lthough [plaintiff] testified that she has panic attacks, the [plaintiff] stated that she shops in stores. . . . She also stated that she spends time with others." Id. Thereafter, when constructing the RFC assessment, the ALJ remarked that Dr. Quinn indicated that plaintiff repeatedly reported that it is not difficult at all for her meet home, work or social obligations. R. 23. Moreover, the ALJ specifically found that the opinion of state agency consultant Dr. Siegel was supported by the record as a whole and consistent with Dr. Gastaldo's observation that plaintiff's attention and concentration span were normal. R. 23. Dr. Siegel had opined that although plaintiff had some mild social interaction limitations in responding to criticism from supervisors, she was overall not significantly limited and could interact with the general public, ask questions, request assistance, get along with coworkers or peers without distracting them, maintain socially appropriate behavior, communicate clearly and behave predictably in most social situations. R. 89. Finally, on her Adult Function Report, plaintiff explicitly admitted that she has no problems getting along with family, friends, neighbors or others. R. 227. She also stated that she gets along "very well" with authority figures. R. 228. At the hearing, plaintiff offered no contrary testimony, but rather focused her discussion of her mental impairments on her panic attacks that are largely controlled by medication. R. 53.

Undoubtedly, the ALJ could have offered a more explicit justification for why he reached seemingly inconsistent conclusions at steps three and five of the analysis.  Nevertheless, and quite unlike the <u>Seagraves</u> and <u>Decker</u> line of cases, the ALJ adequately alluded to the rationale underlying his decision.  This reasoning allowed sufficient review of his decision and revealed ample support in the record for the absence of any limitation on plaintiff's social functioning.  It is well established that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989).  Indeed, plaintiff herself does not now identify any evidence demonstrating any work-related limitations caused by a social impairment on which a contrary decision could rest.  Accordingly, I reject this portion of plaintiff's request for review.

## CONCLUSION

While plaintiff in this case certainly has impairments that impact her abilities, I find that the ALJ's disability decision is well supported by substantial evidence of record.  Therefore, I will deny plaintiff's request for review and affirm the decision of the Commissioner of Social Security.

An appropriate Order follows.